## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| BONNIE RAMSEY, ON BEHALF OF ALL WRONGFUL DEATH HEIRS OF ROBERT McCOMAS, DECEASED and BONNIE RAMSEY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBER McCOMAS, DECEASED<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MOTORS LLC,<br><br>Defendants. | Civil Action No: 3:17-cv-863-J-39JRK<br><br>JURY TRIAL DEMANDED |

### ORIGINAL COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, BONNIE RAMSEY, individually and as personal representative of the estate of her brother, Robert McComas, by and through counsel, and files this Original Complaint for Damages and Demand for Jury Trial, and states as follows:

### I.    INTRODUCTION

1.    This action arises out of a motor vehicle accident that occurred on July 29, 2015. On that date, Mr. McComas was driving a 1999 Pontiac Grand Am in Jacksonville, FL 32220. Upon information and belief, as a result of a hidden defect in his Grand Am, Decedent's vehicle unexpectedly lost power and caused him to strike the rear of a dump truck.    Despite significant front-end damage to the vehicle, no airbags deployed and Mr. McComas died as a result.

2.    Prior to the accident, Defendant General Motors LLC ("New GM" or "Defendant") knew that Decedent's car was defective, yet failed to adequately disclose the defect or warn users of its existence.    Rather, Defendant negligently, intentionally, purposely,

1

fraudulently, and systematically concealed the defect from Decedent, the federal government, and the public at large.

3.     Accordingly, Plaintiff brings this wrongful death and survival action against New GM asserting claims for wrongful death, survival, negligence, fraudulent concealment, strict products liability, and punitive damages.

## II     PARTIES

4.     Plaintiff Bonnie Ramsey resides in Jacksonville, Florida, is the sister of Robert McComas, and is in the process of seeking appointment as the personal representative of his estate.

5.     General Motors, LLC ("New GM") is a Delaware limited liability company.  On July 10, 2009, New GM acquired substantially all of the assets and assumed certain liabilities of General Motors Corporation ("Old GM") by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code.  New GM assumed specific liabilities of Old GM, which filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 1, 2009.  Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees including, on information and belief, most of the same senior-level management, officers, and directors.  New GM also acquired Old GM's designs, tools, inventory, books, records, and its key contracts, among other essential assets.

6.     Under the Purchase Agreement, New GM assumed liability for crashes after the closing date of the Purchase Agreement involving Old GM vehicles causing personal injury, loss of life, or property damages.

2

7.    New GM also undertook contractual responsibility for compliance with a wide

range of laws and other regulations, including:

>    (a)    From and after the Closing, Purchaser [New GM] shall comply
>    with the certification, reporting and recall requirements of the National
>    Traffic and Motor Vehicle Safety Act, the Transportation Recall
>    Enhancement, Accountability and Documentation Act, the Clean Air Act,
>    the California Health and Safety Code and similar Laws, in each case, to
>    the extent applicable in respect of vehicles and vehicle parts manufactured
>    or distributed by Seller [Old GM].
>
>    (b)    From and after the Closing, Purchaser [Defendant New GM] shall
>    be responsible for the administration, management and payment of all
>    Liabilities arising under (i) express written warranties of Sellers [Old GM]
>    . . . (ii) Lemon Laws.

8.    At all times relevant to the claims in this lawsuit, Old GM and New GM were in

the business of developing, manufacturing, and marketing cars throughout the United States

generally, and specifically in Texas.  New GM has a network of authorized retailers that sell its

vehicles and parts throughout the United States.  New GM maintains its principal place of

business at 300 Renaissance Center, Detroit, Michigan.

9.    The allegations pertaining to Old GM are included herein because (a) with respect

to Products Liability claims, New GM expressly assumed liability for the conduct of Old GM,

and (b) the knowledge and conduct of Old GM was inherited by New GM from its inception, as

it was known by Old GM employees when they became New GM employees and could further

be ascertained from Old GM documents in New GM files.  This Complaint does not assert any

causes of action against Old GM; all causes of action and attributions of liability are directed

solely against Defendant New GM.

## III    JURISDICTION AND VENUE

10.    This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C.

§ 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and

3

because the amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost, and because, the injuries and damages occurred in this District.

11.     Venue in this action properly lies within this District pursuant to 28 U.S.C. § 1391 because because a substantial part of the acts and/or omissions giving rise to these claims occurred within this District and/or the injuries and damages occurred in this District.

## IV     FACTUAL BACKGROUND

12.     Upon information and belief, Decedent's Grand Am lost power because of a vehicle defect, described more fully below.  The vehicle is the subject of National Highway Traffic Safety Administration ("NHTSA") Recall, which New GM describes as a safety-related defect whereby the ignition switch can inadvertently and unexpectedly move out of the "run" position due to "weight on the key ring and/or road conditions or some other jarring event."

13.     In late 2014, New GM attempted to recall millions of vehicles for this widespread, internally known defect, and Old GM and New GM's knowledge of said defect spans back more than a decade.

14.     Upon information and belief, New GM is aware that its efforts to notify consumers repair these defective vehicles are inadequate, leaving a huge number of defective vehicles on the road.

**A.     Old GM and New GM Concealed a Known Defect in Plaintiff's and Other Vehicles**

*i.     The Defective Vehicles*

15.     As used in this Complaint, the "Subject Vehicles" refers to the following vehicles sold in the United States, which were equipped at the time of sale with an ignition switch sharing a common defective design:

- 2005-2009 Buick Lacrosse;

4

- 2006-2011 Buick Lucerne;

- 2003-2014 Cadillac CTS;

- 2000-2005 Cadillac Deville;

- 2006-2011 Cadillac DTS;

- 2004-2006 Cadillac SRX;

- 2010-2014 Chevrolet Camaro;

- 2011-2013 Chevrolet Caprice;

- 2005-2010 Chevrolet Cobalt;

- 2006-2011 Chevrolet HHR;

- 2000-2014 Chevrolet Impala;

- 1997-2005 Chevrolet Malibu;

- 1997-2005 Chevrolet Malibu Classic;

- 2000-2007 Chevrolet Monte Carlo;

- 1999-2004 Oldsmobile Alero;

- 1998-2002 Oldsmobile Intrigue;

- 2005-2010 Pontiac G5;

- 2008-2009 Pontiac G8;

- 1999-2005 Pontiac Grand Am;

- 2004-2008 Pontiac Grand Prix;

- 2006-2010 Pontiac Solstice;

- 2003-2007 Saturn Ion; and

- 2007-2010 Saturn Sky.

16.     The ignition switches in the Subject Vehicles contain several common switch points, including "run" (or "on"), "off," and "accessory." At the "run" position, the vehicle's motor engine is running and electrical systems have been activated; at the "accessory" position the motor is off, and electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally and manually turn the key in the ignition to move to these various positions.

17.     In the Subject Vehicles, the ignition switch may suddenly and without warning move from the "run" to the "accessory" or "off" position while the vehicle is in motion. New GM has attributed this to a number of catalysts, including a detent plunger in the ignition switch which does not generate sufficient torque to keep key in its proper position while the vehicle is in motion. Put simply, the ignition switch fails to stay in the "run" position when it is supposed to stay in the "run" position.

18.     In addition, the Subject Vehicles contain an ignition cylinder, with the key position of the lock module on the steering column and an ignition key with a slot for a key ring at the top. By design, the ignition switch was placed low on the steering column, making it easy for a driver of regular height to inadvertently impact the ignition switch with his or her knee while operating the vehicle. Such an impact may jar the ignition switch and cause it to move from the "run" to the "accessory" or "off" position.

19.     The ignition switch on the Subject Vehicles is prone to fail during ordinary and foreseeable driving situations (such as traveling across bumpy or uneven roadways or when the vehicle experiences extreme jarring movements). When the ignition switch "fails," and the ignition switch moves from the "run" to the "accessory" or "off" position during ordinary

6

operation of the vehicle, the power to the vehicle is terminated (even at highway speeds), and the vehicle loses power steering and power brakes, which suddenly and without warning makes the vehicle difficult to control.

20.     Each of the Subject Vehicles also contains an airbag system that is disabled when the ignition switch on the vehicles fails during ordinary and foreseeable driving situations. Thus, as a result of the defective design of the Subject Vehicles, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, and power steering and brakes. Such a failure may occur unexpectedly and during normal operation of the vehicle.

21.     The ignition switch systems at issue are defective in at least three major respects. First, the switches are simply weak; the torque, i.e., force, required to move the switches out of "run" and into the "accessory" position is too low, which causes inadvertent switch rotation. Second, because the ignition switches are placed low on the steering column, a driver's knee can easily bump the key (or the hanging keychain attachments) and cause the switches to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switches move from the "run" to the "accessory" or "off" position, vehicles lose power, disabling critical safety systems such as power brakes, power steering, and airbags even if the vehicles are traveling at high speeds. This single point of failure is particularly dangerous given the susceptibility of the switch to inadvertent rotation due to, among other things, low torque, knee-key events, the use of a slotted head key design and/or heavy keys, and switch location.

22.     Both Old GM and Defendant New GM recognized that the defect was not limited to simply a low torque issue and were aware of safer alternative designs, but chose not to employ them due to cost and to avoid disclosure of the defective ignition switch and its tragic

7

consequences. And while Defendant New GM has recalled millions of vehicles for defective ignition switches, it knew – and its own engineering documents reflect – that the defect transcends the low torque switch that was originally installed in vehicles subject to ignition switch defect-related NHTSA recalls. Thus, Defendant New GM's recall of the Subject Vehicles has been, to date, incomplete and inadequate, and it underscores Defendant New GM's ongoing fraudulent concealment and misrepresentation of the nature and extent of the defects. Defendant New GM has long known of and understood the ignition switch defect and failed to fully remedy the problems associated with this defect.

23.     Decedent's vehicle contained the defective ignition switch and airbag system described in this Complaint. The ignition switch defect precludes drivers and owners of the Subject Vehicles from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Subject Vehicle occupants as well as those in vehicles around them. Further, because Old GM and Defendant New GM concealed the existence of the ignition switch defect as defined herein, no driver or owner of the Subject Vehicles, including Decedent, knew, or could reasonably have discovered, the ignition switch defect.

*ii.     New GM Was Aware of the Ignition Switch Defect from the Date of its Creation, but Concealed the Defect for Years*

24.     In 2009, Old GM declared bankruptcy in the United States Bankruptcy Court in the Southern District of New York.

25.     On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets to New GM, which retained the vast majority of Old GM's senior and management level executives and engineers who knew that Old GM had manufactured and sold millions of vehicles afflicted with an ignition switch defect. Those

employees' knowledge regarding the ignition switch defect is imputed to New GM, whenever obtained.

26.     On or around the day of its formation as an entity, New GM also acquired, *inter alia*, the knowledge of the contents of Old GM's "files" and company "documents." To that end, New GM acquired notice of the safety-related defects contained in Old GM's files, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the defective ignition switch and airbag system described herein.

27.     Defendant New GM also had ongoing obligations under the Safety Act to monitor both Old GM and New GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. Defendant New GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired substantially all of Old GM's assets.

28.     The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21. Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety. 49 C.F.R. §§ 576.5 to 576.6.

9

29.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

30.     Defendant New GM used several processes to identify safety issues, including the Transportation Recall Enhancement, Accountability and Documentation ("TREAD") database and Problem Resolution Tracking System ("PRTS"). The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to Old and New GM vehicles. The database included information from (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought Old and New GM vehicles and from Captured Test Fleet reports; (v) complaints from the OnStar call center; and (vi) a database

maintained by Old and New GM legal staff to track data concerning complaints filed in court. A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various Old and New GM vehicles. The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback. The PRTS process involves five steps: identification of the issue; identification of the root cause; identification of a solution; implementation of the solution; and feedback.

31. Because the same employees carried out the TREAD Act obligations at Old GM and Defendant New GM, they not only retained the knowledge they acquired at Old GM—they were in fact required to do so. This further supports the propriety of imputing the knowledge of Old GM employees to New GM, even where that knowledge stems in part from their performance of the same or similar roles at Old GM.

32. In setting forth the knowledge and conduct of Old GM in connection with the ignition switch and other defects set forth herein, Plaintiff alleges that New GM is liable for the actions of Old GM only with respect to the Products Liability claims for compensatory damages, which are an Assumed Liability. With respect to Plaintiff's Independent Claims, Plaintiff does not seek to hold Defendant New GM liable for the actions of Old GM. Instead, the knowledge and conduct of Old GM is generally important and relevant because it is imputed to Defendant New GM under governing principles of agency law.

33. From the day of its formation as a corporate entity, through the knowledge of Old GM employees familiar with this information who continued on at New GM after the bankruptcy sale and Old GM documents retained in New GM's files, New GM acquired notice and full knowledge of the ignition switch defect in Old GM vehicles.

11

34.     Rather than promptly recalling the Subject Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Subject Vehicles. Moreover, New GM continued to manufacture vehicles with the ignition switch defect after it emerged from bankruptcy. Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled due to the ignition switch defect.

35.     Old-to-New GM engineers identified several ways to attempt to fix the ignition switch problem over the years. Unsurprisingly, these solutions echoed solutions that Old GM engineers had proposed years before the bankruptcy sale, but had decided not to implement because of cost concerns. For example, New GM engineers proposed adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the "run" position, and adding a push button to the lock cylinder to prevent it from slipping out of run. New GM ultimately rejected each of these ideas.

36.     New GM's years long internal "investigation" into the Subject Vehicles—as well as all of the Old GM documents that were included in the "Purchased Assets" from the bankruptcy sale—provided New GM with actual knowledge, long before Decedent's death, of the ignition switch defect. Notwithstanding these facts, New GM continued to fraudulently conceal the nature and extent of the defects from the public, inducing customers to purchase Subject Vehicles with no knowledge of the existence of these serious and uniform defects, and no provision to avoid the safety risks of operating the Subject Vehicles.

37.     Moreover, throughout the entirety of its corporate existence, New GM received numerous and repeated complaints of moving engine stalls and/or power failures in the Subject Vehicles. These complaints are yet more evidence that New GM was fully aware of the ignition switch defect and should have timely announced a recall much sooner than it did.

38.     New GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but also in hundreds of customer complaints recorded in Old GM's and New GM's internal complaint logs and documents.  New GM received and reviewed complaints of safety issues from customers with Subject Vehicles in nearly every state nationwide.  Documents produced by New GM show that New GM was aware of customer complaints of stalling Subject Vehicles in many of these states and ultimately did nothing about them.  These complaints, of course, are in addition to the multiple non-deploy incidents of which New GM became aware and even investigated from at least 2005 to the present.

**B.      New GM Finally Issues Recalls**

39.     In NHTSA Recall Campaign Number 14V047000, of February 10, 2014, affecting air bags and the electrical system, New GM reported that the ignition switch "may turn off" of 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.  New GM stated: "This defect can affect the safe operation of the airbag system."  New GM advised that until the defect was repaired, "customers should remove all items from their key rings, leaving only the ignition key.  The key fob (if applicable) should also be removed from the key ring."  The recall campaign initially involved 619,122 model year 2005-07 Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  New GM later increased the recall to include an additional 748,024 model year 2006-07 Chevrolet HHR and Pontiac Solstice vehicles and 2003-2007 Saturn Ion vehicles and 2007 Saturn Sky vehicles.  Approximately a month later, New GM reported that defective ignition switches may have been used as service replacement parts on other vehicles, and again expanded the recall to include 2008-10 Chevrolet Cobalt, Saturn Sky, and Pontiac G5 and Solstice, as well as 2008-11 Chevrolet HHR vehicles.

13

40.     In June 2014, New GM recalled all 2010-14 Chevrolet Camaro vehicles manufactured December 3, 2008 to May 23, 2014 as part of NHTSA Campaign Number 14V346000. In those vehicles, the ignition switch was defective such that the driver may accidentally hit the switch with his/her knee, unintentionally knocking the key out of the run position, turning off the engine. If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

41.     Also in June 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V355000 for defects that may cause the ignition switch to turn off. The 2005-09 Buick LaCrosse, 2006-11 Buick Lucerne, 2000-05 Cadillac DeVille, 2006-11 Cadillac DTS, 2006-14 Chevrolet Impala, and 2006-07 Chevrolet Monte Carlo vehicles were included. "In the affected vehicles, the weight on the key ring and road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine." If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

42.     In July 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V400000 for defects that may cause the ignition switch to turn off. The 2000-05 Chevrolet Impala and Monte Carlo, 1997-03 Chevrolet Malibu, 2004-05 Malibu Classic, 1999-2004 Oldsmobile Alero, 1998-2002 Oldsmobile Intrigue, 1999-2005 Pontiac Grand Am, and 2004-08 Pontiac Grand Prix vehicles were included. "In the affected vehicles, the weight on the key ring and road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine." If the key is not in the run position, as amply

14

described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

43.     Also in July 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V394000 for defects that may cause the ignition switch to turn off. The 2003-14 Cadillac CTS vehicles manufactured August 16, 2001 to April 28, 2014, including Plaintiff's 2004 Cadillac CTS, and 2004-06 Cadillac SRX vehicles manufactured March 20, 2003 to August 11, 2006 were included. The recall involved 554,328 vehicles. New GM stated: "In these models, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine." New GM also described the defect as follows: "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, or if the driver unintentionally bumps the key ring or items attached to the key ring with their knee, the key may unintentionally move away from the run position. If this occurs, engine power, power steering and power braking may be affected, increasing the risk of a crash." New GM also stated: "If the key is not in the run position, the airbags may not deploy if the vehicle is involved in a crash, increasing the risk of injury." New GM further stated, for the first time, that nothing other than the ignition key should be on the key ring.

44.     In September 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V540000. The 2011-13 Chevrolet Caprice vehicles manufactured from October 15, 2010 to December 6, 2013 and 2008-2009 Pontiac G8 vehicles manufactured July 25, 2007, to February 18, 2009 were included. In those vehicles, the ignition switch was defective such that the driver may accidentally hit the switch with his/her knee, unintentionally knocking the key out of the run position, turning off the engine. If the key is not in the run

position, as described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

45.    New GM's ignition switch recalls were not only untimely, they were completely insufficient to correct the safety-related ignition switch defect. Prior to the recalls, New GM had not informed the public, including Plaintiff, that items other than the ignition key should be removed from key rings on vehicles with an ignition switch defect.

46.    To address the ignition switch defect, New GM has replaced or is replacing the defective ignition switches in the Subject Vehicles with a new ignition switch, and has provided new keys without slotted key heads. These repairs fail to address the design defect that causes the key fob/chain to hang too low on the steering column, and fails to address the problems created by inadvertent vehicle shut off – namely, the sudden loss of power brakes, power steering, airbags, and all of the inherent dangers of a moving stall, which can be prevented. It also fails to address the defective airbag system, which becomes immediately disabled once the engine shuts down, which also can be prevented. Thus, even when the ignition switches and keys are replaced, a defective condition will still exist in the Subject Vehicles and the potential will continue to persist for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

47.    In the months that followed the initial ignition switch recalls, New GM finally began to acknowledge that it has been ignoring safety concerns in its vehicles for years. To date, New GM has announced over 35 recalls since February 2014, and it has recalled over 26.6 million vehicles for these defects. This number is staggering; indeed, prior to 2014, no car manufacturer had ever recalled as many vehicles in a single year.

48.     However, New GM refuses to acknowledge what Old GM's and New GM's engineers have long known—the defect in the ignition switches is not limited to inadequate torque performance, but also includes the low placement of the ignition on the steering cylinder as well as the airbag system that is disabled when the ignition is in the "accessory" or "off" position. Even if the ignition switch defect were purely an issue of inadequate torque performance, however, the evidence shows that the ignition switches were defective in that respect.

## V     CLAIMS FOR RELIEF

### COUNT I – Negligence, Gross Negligence, Recklessness

49.     Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

50.     Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed liability for crashes after the closing date of the Purchase Agreement involving Old GM vehicles causing personal injury, loss of life or property damages.  New GM also acquired knowledge of Old GM's activities and the defective ignition switch, and other serious defects, via the mind of the employees, officers, managers, as well as books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order.  Thus, the duties of Old GM are part of the foundation for the liability assumed by New GM.  Further, as identified therein, Plaintiff has claims for a crash involving an Old GM vehicle that caused personal injury and property damage and New GM is therefore liable to Plaintiff.  New GM is also liable to Plaintiff for its own negligence, as discussed herein.

51.     Old GM owed Decedent and other owners/lessees of Subject Vehicles a duty to design, manufacturer, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them, such as Plaintiff.

52.     Old GM and New GM owed Decedent and other owners/lessees of Subject Vehicles a duty to detect known safety defects in Old GM vehicles.

53.     Upon discovery of the ignition switch defect, Old GM and New GM owed Decedent and other owners/lessees of Subject Vehicles a duty to provide thorough notice of the defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

54.     Upon discovery of the ignition switch defect, Old GM and New GM owed Decedent and other owners/lessees of Subject Vehicles a duty to ensure that an appropriate repair procedure was developed and made available.

55.     Old GM and New GM breached their duties identified herein.

56.     Old GM's and New GM's breach of each of their duties identified herein directly and proximately caused Decedent's death.

57.     Old GM and New GM knew that customers, such as Decedent, expect that they will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

58.     Old GM and New GM efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of Decedent and other drivers and passengers of Old GM vehicles.   Old GM and New GM were aware that by providing maintenance and repair information and assistance, including through its authorized dealerships,

18

Old GM and New GM had a responsibility to Decedent and other drivers and passengers to take the reasonable measures listed above.

59.     By reason of New GM's assumption of liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes after the closing date of the Purchase Agreement involving Old GM vehicles causing personal injury, loss of life or property damages, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Decedent and Plaintiff are among the liabilities of Old GM assumed by New GM.

60.     Independent of any failures by Old GM as described herein, New GM breached its duties to Decedent by failing to provide appropriate notice of and repair procedures for Plaintiff's defective 2004 Cadillac CTS.  In doing so, New GM departed from the reasonable standard of care required of it.

61.     It was foreseeable that if Old GM and New GM did not provide appropriate notice and repair procedures for the Subject Vehicles, lots of people would be injured and die.

62.     Decedent could not through the exercise of reasonable diligence have prevented the injuries caused by Old GM and New GM's negligence, gross negligence, and recklessness.

63.     Old GM's and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Old GM and New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

## COUNT II - Fraud by Non-Disclosure

64.  Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

65. Plaintiff does not base this claim on any Old GM knowledge or conduct, except to the

19

extent New GM inherited information from Old GM employees and documents.

66.    As set forth above, New GM possessed independent knowledge of the defects in Old GM and New GM vehicles with the ignition switch defect and the need to undertake steps to resolve the defect condition to prevent injury. This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the defective ignition switch maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

67.    New GM intentionally concealed or failed to disclose material facts related to the ignition switch defect from Decedent, the public, and NHTSA.

68.    New GM had a duty to disclose the material facts to Decedent; and New GM knew: (1) that Decedent was ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) Decedent did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed. New GM's fraud, fraudulent concealment and fraudulent non-disclosure were all components of the subject incident of the Decedent.

69.    By failing to disclose these material facts, New GM intended to induce Decedent to take some action or refrain from acting.

70.    Decedent relied on New GM's non-disclosure, and died as a result of acting without knowledge of the undisclosed facts.

### COUNT III - Strict Liability

71.    Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

72.     Old GM and New GM, at all times relevant to this action, were engaged in the business of designing, testing, manufacturing, distributing, and selling automobiles, including the Subject Vehicles.

73.     In particular, Old GM designed, tested, manufactured, distributed, and/or sold Decedent's defective car.

74.     Decedent's defective car and other Old GM vehicles as well as New GM vehicles were defective due to the ignition switch defect at the time the vehicles were manufactured or sold by Old GM and New GM or when the vehicles lefts Old GM's and/or New GM's control.

75.     The ignition switch defect described herein is a design defect and a failure-to-warn defect. Old GM and New GM both had a continuing duty to warn of the ignition switch defect in the Subject Vehicles, and a continuing duty to inspect and retrofit the Subject Vehicles in order to remedy the defect.

76.     The Subject Vehicles were expected to and did reach users and consumers without substantial change in the condition in which they were sold.

77.     As a result of the inherent ignition switch defect, Decedent's defective car and other Old GM and New GM vehicles with that defect were unreasonably dangerous, as defined by ordinary consumer expectations, to persons who use or might reasonably be expected to be affected by those vehicles.

78.     Decedent's car and other Old GM and New GM vehicles with the ignition switch defect were in a defective condition, creating risk of harm to users or consumers, including Decedent.

79.     Decedent was a person who used or could have reasonably be affected by the defective car.

21

80.    The ignition switch defect set forth herein directly and proximately caused Decedent's death.

81.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed liability for crashes after the closing date of the Purchase Agreement involving Old GM vehicles causing personal injury, loss of life or property damage. As identified therein, Plaintiff has a claim for a crash involving an Old GM vehicle that caused personal injury, loss of life or property damages and New GM is therefore liable to Plaintiff. New GM is also strictly liable to Plaintiff for its failure to warn of the ignition switch defect in Decedent's car.

82.    Decedent's injuries and losses were directly and proximately caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling, and/or supplying Decedent's car car in a defective condition for which New GM is strictly liable to Plaintiff pursuant to Restatement (Second) of Torts § 402A because that liability was assumed by New GM.

83.    Decedent's injuries were directly and proximately caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling, and/or supplying Decedent's car without proper and adequate warnings, instructions, and/or guidelines for safe use for which New GM is strictly liable to Plaintiff because that liability was assumed by New GM.

84.    By reason of New GM's assumption of liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes after the closing date of the Purchase Agreement involving Old GM vehicles causing personal injury, loss of life or property

damage, the failures of Old GM described above that contributed to or were causally connected to Decedent's death are among the liabilities of Old GM assumed by New GM.

## COUNT IV – Wrongful Death

85.     Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

86.     Plaintiff hereby asserts claims under Florida's wrongful death statute and seeks all damages permitted thereunder.

## COUNT V – Survivorship

87.     Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

88.     Plaintiff hereby asserts claims under Florida's survival statute and seeks all damages permitted thereunder.

## COUNT VI - Damages

89.     Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

90.     Plaintiff prays for damages against the Defendant in a sum of money in excess of the jurisdictional amount of Seventy-Five Thousand Dollars ($75,000.00) plus costs and any such other relief to be deemed just and equitable to which she is entitled.

91.     Decedent's death Plaintiff's injuries were directly and proximately caused by Old GM's and Defendant New GM's conduct and omissions.   Accordingly, Plaintiff is entitled to reasonable and proper compensation for the following legal and actual damages:

        a.     past medical expenses;

        b.     pain and suffering and mental anguish suffered by Decedent;

c.      funeral expenses;

d.      loss of expected earnings of the Decedent;

e.      loss of love, society and companionship;

f.      loss of goods or services Decedent would have provided;

g.      loss of inheritance; and

h.      all such other damages to which Plaintiff may show herself entitled at law
        or in equity.

### COUNT VII Punitive Damages for Independent Claims
### Based on New GM's Knowledge and Conduct

92.     Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

93.     Plaintiff would further show that the clear and convincing evidence in this case will prove that New GM acted with reckless disregard of the health and safety of others in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of Decedent's car and other Old GM and New GM vehicles with the ignition switch defect, New GM nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Decedent.  Therefore, Plaintiff seeks punitive damages against New GM.

94.     Alternatively, Plaintiff would further show that the clear and convincing evidence in this case will prove that New GM acted intentionally and with malice in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of Decedent's car and other Old GM and New GM vehicles with the ignition switch defect, New GM nevertheless proceeded with indifference to the rights, safety, or welfare of others, including the Plaintiff.  Therefore, Plaintiff seeks punitive damages against New GM.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Defendant be cited to appear and answer herein, and that upon final hearing of the cause, judgment be entered for Plaintiff against Defendant for actual damages, as alleged, and exemplary damages with respect to Plaintiff's independent claims; together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which Plaintiff may be entitled at law or in equity.

## JURY DEMAND

Plaintiff requests a trial by jury.

Dated:        July 26 , 2017

Respectfully submitted,

By: _____

Joseph A. Osborne, Esq.
Florida Bar No.: 880043
OSBORNE & ASSOCIATES LAW FIRM
433 Plaza Real Blvd., Suite 271
Boca Raton, FL 33432
Telephone: (561) 293-2600
Facsimile: (561) 923-8100
Email: josborne@oa-lawfirm.com
*Trial Counsel*

Avram J. Blair
AVRAM BLAIR & ASSOCIATES P.C.
3120 Southwest Freeway, Suite 215
Houston, TX 77025
Telephone: 713-936-2609
Facsimile: 832-203-8286
Email: ablair@ablairlaw.com
*Pro Hac Vice application to be submitted*

*Attorneys for Plaintiff*